Good morning. May it please the court. My name is Martin Molina. I'm on CJA appointment by the court representing the appellant Leonardo Delgado-Pidaca in this case. There are several points that I'm raising in the appeal. Number one is the sufficiency of the evidence to sustain his conviction on count two, the conspiracy to distribute methamphetamine. He was convicted on count one, on a RICO conspiracy count, and on count two, conspiracy to distribute methamphetamine. The government proceeded on two theories of conspiracy liability. Number one is association with co-defendant Garibay, and number two, and that the taxing activities, street taxing drug dealers in the area amounted to conspiring with those drug dealers. And I'm going to address those points in turn. Mr. Delgado and Garibay worked together collecting street taxes for the Mexican mafia. What the government presented was that Garibay was also involved in his own drug dealing activities. But what the government did not present at trial was a connection between Mr. Delgado and Garibay's drug dealing activities. And I can, and I have three areas where I can, where it is shown that there was no evidence of even a slight connection between Delgado and Garibay's drug dealing activities. Particularly the telephone conversations that were introduced between Delgado and Garibay, where he's calling on Garibay to meet up with him on July the 25th and the 26th, on September the 10th, and also September the 16th, for the purposes of getting the money that he had been collecting from drug dealers. In none of those conversations was there any mention or any question from Mr. Delgado as to Garibay, as to his drug dealing activities, nor any information transmitted from Garibay to Mr. Delgado about his drug dealing activities. Also of importance is the intercepted communications between Garibay and the people that he was dealing drugs with. In none of those conversations did the name of Mr. Delgado ever come up. And there was a plethora of intercepted communications that were introduced about Garibay's drug dealing activities. On August the 30th and August the 31st, and also on September the 5th, where he dealt with a man by the name of Palofox. And also likewise, on July the 15th, where Garibay dealt with Palofox in trying to arrange a deal for another person called Ricky Chavez. And also on Garibay's drug dealing activities with a woman by the name of Rafaela, on September the 4th, the 5th, and also on the 15th. What are you saying, that this had nothing to do with drug dealing and paying rent for, I mean, paying money to get the drugs and supplying drugs? Well, what I'm saying is that there was no, Mr. Delgado did not do anything in furtherance of Garibay's drug dealing activities. They were working together for the purposes of collecting street taxes from drug dealers. But Garibay at the same time had his own drug dealing activities, and Mr. Delgado did not do anything to further, there was not a slight connection with his own drug dealers. My understanding was Garibay was collecting rents for Delgado. Yes, he was. Working for Delgado. They were working together. The role of Garibay was to monitor other drug dealers working in the area, and to collect street taxes or rents from them, and then giving the money to Delgado, who would then give the money over to Rebecca Padilla, who is the wife of Luis Garcia, the Mexican mafia main member who was in prison. That's the, and I think your honor is pointing to the other theory of conspiracy liability that's raised by the government, which is essentially, if you tax illegal activities, that makes you a co-conspirator of those illegal activities. That may be true, but in order for that to be true, the person who's doing the taxing has got to be doing something in furtherance of those drug dealing activities that are being taxed. And in this case, the evidence that was presented was that the drug dealers were paying taxes under threat of physical assault. There was not an affirmative action on the part of Mr. Delgado in order to assist them in their drug dealing activities in the area, or facilitate their drug dealing activities in the area. And this became very revealing in a conversation that was captured between Mr. Delgado and also by Cortez, a drug dealer, where he said, if you don't pay taxes, then your name will be dropped, and the Mexican mafia will take care of you. I mean, basically his words were, the names will be dropped, and then the homies, if they decide that he's got to go, he's got to go, which meant physical assault. And the government also said that during Mr. Delgado's sentencing, when he said that the deal with the drug dealers was not simply failure to pay, was not simply go somewhere else with your drug dealing activities, but that there will be retribution. So that was the reason why they were paying the money. Not because Mr. Delgado was facilitating their drug dealing activities, but because it was under threat of physical assault. And that doesn't amount to an affirmative act on his part to facilitate their activities. He might have known that these people were dealing drugs in the area, but knowledge and awareness of those drug dealing activities without taking an affirmative step in facilitating them amounts to joining that conspiracy. Thank you. And I believe my time is up, Your Honor. All right. Thank you. Good morning. Gary Bertram on behalf of Appellant Robert Colasso. I have five minutes. I would like to spend my time talking about the substitution of counsel issue that's in our individual brief. Okay. About two and a half months before trial, Mr. Colasso informed his attorney that he wanted to have a new counsel appointed. Apparently, his attorney contacted the district court, and about six weeks before trial is when the matter actually came before the district court. At the initial hearing on this issue, both Mr. Colasso and his court-appointed counsel discussed with the district court what the problems were with respect to their relationship. And following the hearing, the district court agreed and appointed new counsel for Mr. Colasso. There was an issue about whether the new counsel would be able at that point to keep the current trial date, and so there were some issues about who was going to be the attorney in the case. And there was a hearing about two weeks later where Mr. Colasso was before the court with an attorney who was supposed to be taking the case. This is the new attorney? This is Robert Schlein. That's right, Judge. And the judge asked Mr. Schlein if he was ready to proceed with the case. Mr. Schlein said, I'm not yet. I haven't met Mr. Colasso. And the judge said, you know, why haven't you met Mr. Colasso? And apparently, he had gone to the jail to see him. Mr. Colasso hadn't gone out. And the judge said to Mr. Colasso, why didn't you see Mr. Schlein? And at that point, Mr. Colasso said he wanted to remain silent and not answer the question. And right there at that point, in a snap judgment, the district court said, okay, motion denied. You're going to trial with Ms. Franklin, and that's the end of this. And it's our position. Okay, you're going to tell me. What should the district court have done when he clearly wasn't cooperating with Mr. Schlein? He needed to delve a little deeper into what was going on. There was clearly a frustration. There was clearly something that was happening that had Mr. Colasso not come out to see his client in the jail. We still don't know what that is because the record was never developed. Circumstantially, it looks like he's, as Judge Wardlaw said, not cooperating. He doesn't like his lawyer because she's a woman. And then a male is put on the case, and he won't meet with him. You're right, Judge. That first answer was clearly non-cooperative. It was non-responsive. But I think given the gravity of this case, given the allegations with respect to the attorney-client breakdown, I think the judge needed to do more in this situation. Ask another couple of questions. Explain to him, look, if you don't explain to me what's happened with this other guy, you're stuck with Ms. Franklin, and I already know how you feel about that. So I think there needs to be more of a dialogue between the judge, District Judge Benitez, and Mr. Colasso, other than just hearing the one answer, stopping and saying, we're done, you're stuck with him. She did a great job, though. There's no complaint that she was ineffective, right? There's no issues concerning her. It's just a matter of whether or not the judge should have taken the time to make the switch. That's the first issue, and that's totally brief. And I'd like to move on in my last two minutes to the sentencing issue. This setting is even more troubling. Shockingly, between the conviction and the initial sentencing hearing, they never spoke. I mean, this is a 360-to-life case. A lot of issues at sentencing, career offender issues, enhancements, specific offense characteristics, and we have a situation where not a single meeting between Mr. Colasso and his attorney, between conviction and three or four months later, the sentencing date. And at the initial sentencing hearing, Ms. Franklin said, Judge, we need to talk about the counsel issue. He hasn't been speaking to me. And the judge asked Mr. Colasso what he wanted to do, and he just said, I want to be sentenced today. That was clearly a frustration from Mr. Colasso in terms of the motion had been denied. He didn't think it was going to be granted going forward, and so he just wanted to get the process over with. And I think at the very end of the sentencing hearing, the second hearing where the sentence was imposed, Judge Benitez, he was struggling whether this should have been a 20-year case or a 30-year case, and he said, I want to think about this for a few weeks, and I want to, you know, think about what's been said. Look at the record and decide what the appropriate sentence is. Can I interrupt briefly? Sure, Judge. The Ninth Circuit has said that even if there's a complete breakdown in communication, which obviously there was here, the Sixth Amendment still doesn't require new counsel if the conflict arose from general unreasonableness or manufactured discontent of the defendant. So in light of all the circumstances, you know, the defendant may have very well knew the end of the time had arrived, correct? In terms of the sentencing? Yeah. Well, I think he felt despair. I think he felt frustration. But he needed help. He needed the help of a lawyer that he could communicate with at that point in his case. But he did a great job at sentencing. They hadn't communicated. He didn't allocute. He wasn't prepared to allocute. He didn't give the point I was trying to make is when the judge asked for that extra time to really think about the case, he said no. Mr. Klausner said, no, let's go forward today. Clearly, obvious at least to me reading the record, that it was going to be a 30-year sentence if he didn't give Judge Benitez the extra time. And so I think even if the Court feels like the pretrial denial of the motion to substitute was acceptable given the unique characteristics of that second hearing, I think he desperately needed an attorney he could communicate with for the sentencing. And by not having one, I think likely a 20-year sentence turned into a 30-year sentence. So I'd ask the Court to remand the case to the district court in the alternative with instructions that new counsel be appointed for a sentencing. I'm on the panel. I'll do the sentencing down there. And give Judge Benitez the chance that he really wanted to flesh this out a little bit more, think a little bit more about the issues, and decide what the appropriate penalty was. All right. Thank you, counsel. Good morning, Your Honors. May it please the Court, John Lemon IV, Julio Rodriguez. I'm also specially appearing for Tim Scott on behalf of Mr. Amador. Mr. Scott's in trial today. Although this Court has held that a law enforcement witness may offer a lay opinion on the basis of his experience in the individual investigation, such opinions may not be based on either hearsay or specialized knowledge. Here, the defendants repeatedly objected both before and during trial that the government was going to present improper expert opinion testimony under the guise of Rule 701. And the cross-examinations of the government's witnesses demonstrated precisely that. The district court, nonetheless, overruled all their objections. The question before this Court is whether that error could possibly have been harmless beyond a reasonable doubt. Would you refresh my recollection as to the subject matter that you're talking about? Yes. This is a large wiretap case. There were thousands of wiretap calls. Before trial, the prosecutor announced that he was not going to introduce any expert testimony on drug jargon. Rather, he said that he was going to introduce law enforcement witnesses who would offer lay opinions under this Court's line of cases in Freeman and Gadsden, lay opinions under Rule 701 based on their experience in this investigation. Now, what that became was just a mantra that the government repeated over and over again with respect to virtually every question that it asked on direct examination of law enforcement witnesses. Agent, based on your experience in this investigation, what does rent mean? And this was something that happened every day during the course of the trial. It became clear through the cross-examinations.  We were denied that. But we cross-examined the government's witnesses, and it became clear that the foundations for their opinions were based, number one, on hearsay, which is what Officer McKean told us explicitly, that his opinions were based in part on what he had been told by informants and what he had been told by other police officers. The informants and police officers were not involved in the investigation of this case? Maybe they were involved in the investigation. I don't know, but that's still hearsay, and it's also special knowledge. Yeah, but it's also personal knowledge acquired through investigation and years of experience. It's hearsay, which is not permissible for a lay opinion under 701, and one specific example is Officer McKean. I don't know that you answered my question, though. Well, it is hearsay. I agree with you, but this is experience gleaned over a number of years of investigation. That's a proper subject for 702, not 701. That's specialized knowledge, and Gadsden and Freeman both specifically state that a 701 opinion may not be based on scientific, technical, or other specialized knowledge within the scope of 702, and Gadsden also says that an opinion may not be based on hearsay. McKean specifically told us in front of the jury that when he formed his opinion, that what rent was, I don't even remember, but whatever rent meant, his opinion as to the meaning of rent, was based on what he had been told by an informant. You can't do that under Rule 701. Maybe under Rule 702, but certainly not under 701, and that happened repeatedly. No, maybe not even 702 either, if that was his only experience, but go right ahead. Right, so this is, you know, the government, I think, characterized this as a synthesis of various source materials. That is not what this court authorized in Gadsden. This is also not plain error, which Gadsden was a plain error case. What would be a permissible basis, counsel, for determining what the word rent means? Okay, so the way that this, according to Gadsden at least. Other than being told by an informant saying rent means tribute. Right. The way this is supposed to work under Gadsden is that, presumably, the law enforcement officer who sits in the room listening to these hundreds or thousands of calls picks up the vernacular just from listening to the calls over and over again. So he picks it up from hearsay. Well, except that it's, he's listening to the phone calls. That's what Gadsden says. So he can listen to the phone calls, but he can't listen to the informants telling him what the phone calls mean. He's forming a lay opinion based on his perception of the phone calls. And I don't agree with Gadsden's holding, but that's what it says. It doesn't say he can go out and ask an informant what something means and then transmit that directly to the jury, which is what this officer did. And this is a recurring problem in these wiretap cases because the government has taken Gadsden to be a blank check to have their law enforcement witnesses basically say whatever they want, provided they preface it by saying, based on what I learned in this investigation. It all comes in. That's the practical effect of Gadsden. But in this case, we actually have, we've demonstrated the problems with the foundation for the opinions. And I was going to address harmless error, but I'm running out of time. So I'm going to move on to the sentencing issue, which this issue was the question that this court did not decide in United States versus Torres about a year and a half ago. I was wondering when someone was going to get to this issue. Right. It's now squarely before this court because we preserved it. You preserved it. And the other question I want to ask is, does the outcome of that make a difference in any of the sentences for any other defendant than Amador? Well, certainly for Mr. Rodriguez, I think it would. He received favorable verdicts on the methamphetamine, but with respect to the heroin, we introduced substantial evidence that he was a heavy, heavy heroin user, and a substantial portion of the drugs that went into the prison were for his personal use. Now, based on the jointly undertaken and reasonably foreseeable formulation that the jury got, they could have concluded that it was reasonably foreseeable. I might be confused. Wait a second. I thought the jury was instructed in the disjunctive. Was. Okay, so it could be either or. Right. Okay. Okay, so sorry if I didn't make that clear. The jury was instructed in the disjunctive. And for Mr. Rodriguez, the jury could have concluded that there were heroin transactions that he didn't have anything to do with because, again, this is a far-flung conspiracy that were nonetheless reasonably foreseeable to him as a member of the organization. And so that's precisely how he would have been harmed. Well, Torres speaks to the conjunctive disjunctive issue, right? Correct. Yeah. Would you say the instruction was incorrect then as a matter of law? Yes. All right. And again, that issue was plain error in Torres, but here it's de novo. It was objected to at the time, but now, but my further question when I jumped to over that was, who's prejudiced by this error in this case? Again, my client was prejudiced by this error because of. Which client? Rodriguez. Okay. Because the jury could well have determined that it was reasonably, that there were heroin sales that were not part of his jointly undertaken activity that were nonetheless reasonably foreseeable to him. That's just one example. And then as to Amador? As to Mr. Amador, I believe he was, he received the unfavorable verdicts on the special verdict form as to every one of these substances. Specifically, I'm not prepared to argue how the jury instruction would have specifically affected him. Okay. Are there any other defendants that you think this would have prejudiced by applying the wrong standard? Again, I believe Mr. Burcham says yes, so I will defer to him and rebuttal. So if you're asking us to reverse on the grounds of an improper instruction, would we not have to require an initial and bank call to overrule Becerra and Banrelos? Well, I don't think so. I think that certainly the Torres panel was in agreement that that's where this is headed. However, the majority. They didn't decide that issue. No, they didn't. But the two judge majority in Torres, well, what they said was that the defendants had a strong argument that, in fact, that the jury should have been instructed in the conjunctive. However, they lost because it wasn't preserved. So it was the dissent in Torres that said that. Concurrence. Well, it was actually, it was Judge Aikuda's, it was her majority opinion before this, it was a dissent saying that, in fact, the law doesn't require. It was specially concurred. Okay. But aren't we told by Banrelos and Becerra that both, that the disjunctive instruction is correct, regardless what the guidelines say and regardless how we get right there? Well, I mean, I think we could talk for a long time about the inconsistencies in the various cases, but certainly the two judge majority in Torres felt. The two judge majority did not decide the question of the instruction. I'm saying to you, and perhaps you're not prepared to answer this, but isn't the law of the Ninth Circuit today that the disjunctive instruction is correct? What I'm saying is the two judge majority in Torres wasn't sure, but they felt no. Well, does that, wasn't sure in how they felt. Does that change the law? It's, it's, it's a victim. I'm not, what I'm saying is that I don't think we can say what the law is. It's that unclear. The problem is we all think that our prior cases, or it seems like some of us think that our prior cases are wrong because we shouldn't have allowed a guideline amendment to influence what the exact, what the law should have been on and how the jury should have been instructed. But the only way that, you know, that we can overrule the prior cases is by going on bonk and hearing it on bonk because other judges on our court might think, no, it's perfectly reasonable to have the disjunctive. You have no recommendation along that line. I don't. I would just add one final point though, which is that it just fundamentally doesn't work. If the guidelines are inconsistent with the jury instructions, because what ends up happening is you, the jury ends up making a finding based on a less rigorous standard by the beyond a reasonable doubt standard. And then once the jury has made that, that baseline finding, then the district court is expected to, to apply a more rigorous standard, which is the conjunctive under the lowest burden of proof. So it's just as a practical matter, it doesn't work. All right. Thank you. And please, the court Daniel Zip on behalf of the United States. I'll go in reverse order of presentation here. Starting with that disjunctive conjunctive issue. I agree with your honor that the Sarah's flatly held that the disjunctive is the correct instruction to give in the statutory realm, not in the guideline realm. So the district court properly gave the instruction here. It's only a question of whether this court wants to go on bonk and try to change the law as it exists. Do you think that we should determine what a statute means by what the guidelines say? I don't. It doesn't seem to make a lot of sense how this will be a real extension of the Chevron doctrine, wouldn't it? Yes. And it certainly wasn't a, you know, a clear intervening event when the guidelines changed that would, would affect how this court interprets eight 41. It doesn't make a lot of sense, but I would submit that this case is not the one that is necessary to, to go on bonk on because this instruction did not make a difference for most or almost all of the, uh, make a difference as to amateur. Um, at least that's the only one that I analyzed that way. I haven't looked at the other ones carefully. And going through it, it looks like Rodriguez and Delgado both got sentences that were below 20 years. Um, so even if the jury made no drug amount finding at all, that wouldn't affect their sentences. So the only two that could be affected were Amador and Colasso who got 24.5 years and 30 years respectively. Um, but the, the reason why it wouldn't have made a difference in this case is because the evidence even as to those two defendants was substantial that the, that this amount of drugs, a hundred grams of heroin for Amador or 50 grams of methamphetamine actual for Colasso was both reasonably foreseeable and within the scope of their conspiracy. Um, I mean, as to Amador, there was a number of intercepted calls where an inmate came into the prison. His name is Luis Cueva. Uh, and then he eventually had 15 grams of heroin that were seized after he was arrested. Um, that's the only sort of hard drugs on the table directly attributed to Mr. Amador. He called, he received calls immediately after that sort of discussing what happened. Um, but there were a number of other calls that made it clear that Mr. Amador was acting as a secretary at the highest level of the Mexican mafia. And then he was actively coordinating with other drug dealing that was going on in his yard and in two other prisons and collecting the proceeds from, from those drug transactions. Well, the problem is since the jury didn't make that finding, we start running into apprendi issues. Like how can we, I mean, doesn't the jury have to make that finding that we can't just say, Oh, we're going to make that finding. That's correct, Your Honor. But they did make that finding. I mean, with Amador that the jury returned a special verdict form that said a hundred grams of heroin. Under the wrong standard, legal standard possibly. If this court changes the law. Under a broader standard that would allow a larger quantity of drugs to be considered than the lesser, if it's a conjunctive standard. Right. But again, that, that's not the law of the court. Okay. But look, the issue that I think you need to speak to is whether or not Amador had knowledge of all the quantities of which he was convicted. There was one intercepted or intercepted calls dealing with one incident that show pretty clearly he attempted to smuggle 15 grams into a prison. Other than that, there's no demonstrable evidence that would allow a jury to convict him of more than a hundred grams. I would disagree. If he were convicted in the, or if they were instructed in the disjunctive, go ahead. Right. And this is not an actual drug distribution case. I mean, the only question is whether this overall conspiracy, whether it would be reasonable foreseeable to him that this entire conspiracy would involve more than a hundred grams of heroin. And there was a number of interceptions besides that one 15 gram incident. There were interceptions when Mr. Amador was sending out reminders to everyone on all the different yards reminding them that his payment was due for this month. There was testimony from a number of cooperators and from an expert describing how the Mexican mafia worked, that they were primarily in the business of bringing these drugs in and that there were multiple, additionally multiple seizures of sort of ounce quantities of heroin that were coming into the prison. So given his sort of overarching role, the multiple interceptions where he's directing people, what to do collecting payments for the drug sales, the fact that there wasn't more than one 15 gram seizure directly attributed to him, doesn't mean that the overall conspiracy did not involve more than a hundred grams. If you're able to show reasonable foreseeability. What about methamphetamine? He could have been convicted of conspiring to distribute 50 grams or more of that. He didn't, there was no evidence he was involved in methamphetamine. Correct? That's correct. And the jury did not return a special verdict as to Amador on the methamphetamine. You mentioned an amount for Coyasso in methamphetamine. I didn't get that. Yes. The jury returned a special verdict to him as to both 100 grams of heroin and to 50 grams of pure methamphetamine or 500 grams of a meth mixture. But in this case, all the methamphetamine that was seized was nearly pure. That would be problematic under Taurus, wouldn't it? In what sense? If there was a requirement by this court that the jury be instructed in the conjunctive, that would be problematic because he couldn't have been convicted of the methamphetamine amounts. No, I don't. I'm not sure that the conjunctive nature of that would affect it. Are we talking about Amador or Coyasso? Amador. Maybe I'm mixed up, but we agree Amador didn't have any involvement in methamphetamine. The jury didn't return a special verdict finding that or that did not find any involvement in methamphetamine. And indeed there were no, there was no proof of that. Other than the fact that he was at the head of a Mexican mafia that was bringing in large quantities of methamphetamine and he was collecting taxes on it. But there was no direct seizures or anything. Mr. Zips, so that I can understand you clearly in the government's position, your position is that the evidence in this case is sufficient. Even if the instruction was erroneous and it should have been in the conjunctive. That's correct. To convict all of these people of well, at least Amador and Coyasso. Right. For two of them, it doesn't matter at all wouldn't have affected anything. And for those two, whether it's conjunctive or disjunctive, the evidence was shows that this amount of drugs was both reasonably foreseeable and within the scope of this overall conspiracy to bring drugs into multiple facilities. Turning, I guess. So in other words, we just like the court in Torres, we can dodge the issue again. Absolutely. Your honor. All right. As to the next issue, which was, I believe the lay opinion testimony, under rule seven Oh one. Can I just ask you briefly about something that's on my mind? It wasn't argued from the defense, but the pre-sentence report as to Amador recommended three levels as being a manager or supervisor. You recall this? Yes. The problem is that the court went ahead and enhanced by four levels. And they did so because they found he, he found the district judge that Amador was an organizer, a leader of criminal activity involving five or more. He didn't make any factual findings on that though. He said, it certainly appears to me that Amador did have, in fact, an aggravated role in this conspiracy. So he didn't really get into any of the evidence that would show who the five people were, any of these sorts of things that you think that merits reversal to have him do that. No, your honor. And this court has made clear that that specific procedural issue, when the question is, did the district court offer enough explanation? The defense council has to object and has to say at that time to the district court, I'm injecting on procedural grounds and you have to explain more absent that it's plain air review. And on the facts of this case, it's would not certainly not be plainly erroneous for the court to conclude that Mr. Amador had this aggravated us. Harper says that a sentencing judge has to make specific findings on the record before adopting an aggravating role enhancement, even if evidence may exist to support the district court's finding. He didn't do that. That seems to be plain air, even absent an objection. Well, I would disagree, your honor. I think in general, the amount of explanation that a court has to give for any sentencing decision sort of depends on the complexity and the issues that are raised when both parties here argued in their briefs as to why he was entitled to an aggravated role and what level it was. Um, and the court's explanation didn't, it didn't require, it seems like the court made a mistake. I disagree, your honor. I mean, the evidence was, and the facts that are there is that Amador was a secretary for Boo Boo Garcia and Garcia was the maid member. So in just in terms of the hierarchy that we know about the Mexican mafia, he wouldn't, he wouldn't have been the highest level. No, he wasn't. But the, the question is not whether he'd be the highest level. It was whether he was a manager or five or more people. The expert testimony in this case was that there are tens of thousands of Mexican mafia syringos around the prison system. And there's then several levels above that at the very top above those thousands are 150 made members. Those are certainly the top of the top immediately below those are what's referred to as secretary's sort of the second level below the top of this massive organization. So there's, it's not even close to a question of whether he was in charge of over. The PSR says that he was not involved or not organized or a leader over an activity that involved at least five or more participants. So what's the, where's the facts to the contrary? Well, I think first of all, there's the expert testimony about his, the Mexican mafia. There were numerous intercepted calls that referred to him as secretary in sort of a deferential way. There was message. There's testimony of him passing along messages to Boo Boo Garcia on behalf of the drug dealers in prison. There was the multiple text interceptions where he's standing around to other higher level people like Ballesteros reminders that he's the one that's collecting the rent on the yard. And he's the one that has the contact to this highest level of made members. And then there's the fact that, that numerous text messages, intercepted calls showed him directing violence on behalf of the Mexican mafia in prison. So this, those text messages, even apart from his role in the overall structure show that this is someone who is in charge of multiple people in multiple prisons and is directing violence and directing taxing on everything. And the district judge didn't say any of that. And the defense didn't object. So plain air would get us over the hump to. Yes, I mean, that was all laid out in the papers. No one really challenged it because it's, it's fairly overwhelming evidence of his role. Turning to the, the next issue, which was the lay opinion testimony, this court in Freeman and in Berrigan held that the type of testimony in this  which is agents interpreting ambiguous terms on calls and text messages is appropriately testimony. As long as it's based on their general knowledge of the investigation, which they have obtained over sometimes months or years. Well, Mr. Lemon distinguishes between 701, which doesn't permit those judgments and testimonies to be lodged on the basis of hearsay and 702, which is just a general experiential, if you will, or experiential sort of standard. Right. Your honor.  and we've conceded that the one issue that they've meant, the one piece of testimony where agent McCain said, I learned what the word rent was at the very beginning of the investigation from what the CI told him, that was improper hearsay, but that term, just keeping on that term rent over the course of trial, it became clear that the agents had come into this, the term rent. I think there was six different times that it was intercepted on the calls. There were a number of cooperating witnesses who testified about rent. The expert witness testified about rent. And you get the sense, even from what was presented at trial, that this idea of rent was basically throughout the entire investigation through multiple cooperators and through multiple interceptions. And what Freeman and what bear again say is in that context, when we're talking about an intimate knowledge of an investigation over the course of months, of course the agent's going to know what rent is through a sort of synthesis of all of that. He's learned as part of the investigation and it's that knowledge that becomes helpful lay testimony and interpreting it. And you saw that, you know, the defense focuses on a couple individual comments, that eight ball and the rent, both of which occurred sort of early in the investigation. If you go through and look all the times that the agents interpreted the calls, the most of them are either interpreting people's nicknames of which almost everyone in this case had some sort of moniker or non drug jargon related concepts like touchdowns or green dots or any, a number of the back or other terms that are not sort of general expert drug testimony. Their testimony from these agents about what they've learned about these specific defendants over the course of months of intercepts. And then even those terms like eight ball or Tina or other sort of more common drug terms, the agents carefully testified that what they were when they were offering their opinion as to those terms, it was based on what they'd learned from the facts of this investigation, from what they'd heard on the calls and from all of the investigation and interviews and firsthand experience. You know, as just as one example, when there was testimony that a zip means a one ounce of methamphetamine, what's that? Yes. That was a SCR one 29. And then the agent testified that they conducted a sale with a confidential informant and the amount there that the CI bought was, was one ounce. There were other portions of the testimony where they talked about what half ounce was, and then they could divide up the discussions on the phone and say, Oh, they talked about a six or four and a four. You add those grams up, that becomes 14. That's a half an ounce. And that's how we know that this term means a half or, you know, references to chocolate. Then the agents testified that there was a seizure at the women's prison. And immediately after that, where there's calls about chocolate and they're not being a touchdown, but they can use that inference and say something was seized at the prison. This call call, when they say chocolate is clearly referencing the heroin, which is black and color that was just seized. So it's difficult to go through on a case of the size, all the different examples, but those sort of terminology based on what they've seen and what they've sort of deduced from the calls themselves is proper lay testimony under this court's decisions. Let's see. Next was the request for a new attorney by Mr. Coloso. This court has identified three factors for the court to consider the timeliness, the adequacy of the inquiry and whether there was a complete breakdown in communication. All three of those factors weighed in favor of the court's decision in this case. As to timeliness, once Mr. Coloso requested a new attorney several weeks went by as the court tried to find a male attorney to accommodate his, his inability to her, his dislike of a female attorney. By the time you finally found one who was not conflicted and was available to the role, Mr. Coloso refused to meet with that attorney. And then when the court asked him about it, what happened at the sentencing? It seems to me that the lawyer, the woman, I forget her name at this point, but she said, I haven't talked to this man in months. Maybe we ought to do something different here. So the issue was raised. She, I haven't talked to him. I don't know what he wants to do. Mr. Coloso then said, I want to go forward with sentencing. And then the, the, this was after the court cleared the courtroom. And then the, even at that sentencing hearing, Ms. Franklin could be seen whispering with her defendant and there was some level of communication there. But it's not clear from that, that the court, that the defendant ever even asked specifically that a new attorney be appointed. I guess that was my point was he didn't, but apparently counsel did flag the issue. So it was timely. You'd have to agree. It, you know, at this point we're sentencing. Yes. But again, she put it on calendar for status and then said, I don't know what he wants to do. And then he immediately said, I want to go forward with sentencing, whether that's a request for a new attorney. I don't think it's, it's supported by the record. And as this court made clear in Smith, the amount of inquiry that the court is required to undertake changes over the course of time. If a defendant makes the same request for new counsel based on the same issues. So by the time we got to sentencing, the court had already heard from Mr. Colasso about the nature of his complaints. And they were primarily based on the fact that his attorney was a woman.  Colasso sort of refusing to come out and refusing to cooperate, even with a male attorney in that context, given the history of the case. Once Mr. Colasso said, I'm ready to go forward with sentencing. It wasn't a logical or irrational or an abuse of discretion. Counsel wrote a sentence memo and allocated the facts of the case, right? She did. Yes, Your Honor. So why, why was your adversary or your colleague there? What's the difference? Why, why a 30 year sentence that could have possibly been 20? I think it just comes from the court's comments towards the end of the sentencing. He said, he's at the beginning of the sentencing. He said, I think Ms. Franklin's recommendation of two 40 months seems reasonable to me. And then at the end, he said, I'm now I'm torn between three 60 to 40. Ms. Franklin agreed immediately for a continuance, but then he turned to Mr. Colasso and said, do you want a continuance? And he said, no, just sentence. The issue is even if the council had been changed, there's no evidence. The, the, the district judge exercises discretion to impose the additional 10. He knew he could have given two, 240 months, right? Absolutely. And, and I think if you read the entirety of the sentencing transcript, what became clear as well, the court, when it said two 40 initially was under the impression that Mr. Colasso, I think he's, as he said, it was like a pawn in the system. And then the prosecutor laid out in detail, all the authority that Mr. Colasso had over the minimum security yard. And critically that the fact that Mr. Colasso had ordered the beating and stabbing of a defendant on the yard, Mr. Daniels, who testified at trial in a wheelchair with severe brain damage. And the record indicates was sort of horrific to watch. The prosecutor reminded the court, look, this is the guy that was running that yard that orchestrated this near killing and brain damage of the person that you saw. And then the court went through the extensive criminal history of the defendant. And sort of after going through all of that, it reached the conclusion that that initial impulse of this guy being a pawn, that was two, 240 months would be acceptable, uh, was, was wrong. And that three 60 was the more appropriate sentence. So before you sit down, I just want to go back to the Torres issue one more time. As a prosecutor, is there, do you see problems with our leaving intact? Um, the disjunctive tests, we're setting the minimum and maximum, um, sentences, uh, for drug, um, transactions. Uh, as the instruction for the jury and continuing then to use the conjunctive when actually sentencing. And I mean, is that a problem given that ones where there's two different standards of proof that has to be met? I don't, I'm not sure that it would be a problem. I mean, I think the disjunctive has been the law of this court for 30 plus sentencing, but not for guilt, right? For the statutory scheme. Um, whether that, I mean, this court recognized in Taurus that it doesn't make sense in some ways that there would be a different standard, but whether it would cause any problems. Um, it certainly wouldn't have caused a problem in this case. I'm just trying to weigh the, weigh the necessity for taking this issue on bunk. I mean, as a practical matter, um, can you, can you conceive of cases where this would be a problem? I mean, in this case, Salvador did preserve the objection. He may have preserved it on behalf of others, but can you see a problem with, um, the, the jury finding one quantity to establish guilt under 841 and then the jury finding to maybe look at a narrower quantity? I suppose there could be a situation where if the, you know, if the defendant had a course of conduct with a dealer and then suddenly the dealer showed up with a tractor trailers worth of drugs that was not reasonably foreseeable, but it was within the course of the conspiracy that that would have different results, whether it's sentencing or stat, the statutory range. I, I'm sure that there could be a case in the future, but I don't think that this case on these facts, when it's, it's very clear that it was both reasonably foreseeable and within the scope of the conspiracy, um, that, that it would make any difference. If the jury, if the jury were to find an amount using the disjunctive instruction and therefore impose, if the defendant would be eligible for the maximum sentence, thanks for mandatory. Um, the sentencing guideline requiring the conjunctive sentencing could still be used to sentence below the maximum, correct? It might call in that situation. I might call for a significantly lower sentence, right? But what if it was set? What if it established the minimum? And then you had the conjunctive, which was a lesser quantity. Then you've already been convicted of a crime where you have to have the statutory minimum applied, even though the sentencing guidelines might not call for it. That, that would be a potential situation. Um, it's certainly not the case here where no one was. We know, we know you're here. That's for that's preserved. Anyway. Thank you counsel. And I will give each of you a minute to weigh in on your strongest, or one of you to speak on behalf of. Just to be clear for Mr. Colosso for the Torres issue, he received 30 years on count to the, the drug quantity raised the maximum from 20 years to life for count two. So he was affected by the Torres issue as to count to with respect to the status rate with the council substitution, the council issue, a judgment for your right. The judge did exercise his discretion and sentencing and did it like 30 years for the sentence. But clearly it clearly was a very close call for the judge, such as such the fact that he wanted to put it over and think about it. And if I'm, if I'm next to Mr. Colosso, we have a good relationship and the judge says it, I whispered to Mr. Colosso, you better put this over or he's going to give you 30 years. And they didn't have a relationship where he, where she was able to do that for him. And so he said, let's go forward with sentencing. Again, I think it was frustrated. Like he felt despair over these proceedings with her and their conflict and these issues. And he said, no, I want to do it right now. And he got 30 years. And so I think this is a close enough case. It's sentencing, especially with a 20 year tentative to start, which turned to 30 years, no allocution by Mr. Colosso. It's a close enough sentencing that I think new council with a good relationship with Mr. Colosso very likely might make the difference. Maybe not 20 years, but maybe 25 years, every year counts every day counts. And so I'd like to see judge Mr. Colosso get a resentencing with a new attorney with whom he has a good relationship. All right. Thank you. How did you. With respect to the Torres issue. I just wanted to say very quickly that, first of all, your honor mentioned that Mr. Amador had preserved it. Mr. Rodriguez preserved it as well. So this issue is very much preserved for everybody because everyone joined it. With respect. I wanted to clarify one thing. It says in the answering brief that the jury heard intercepted calls of Rodriguez arranging to smuggle multiple ounces of heroin into Donovan prison. That's just in the statement. It's completely factually incorrect. That did not happen. So I want to point that out because it goes to the issue of, of harmlessness. And finally, the reason this is important to Mr. Rodriguez, even though he didn't get more than 20 years is because when a jury makes a finding as to a quantity, that's necessarily going to be the floor under the guidelines. And so the, the jury findings set the floor for Mr. Rodriguez that affected his guidelines with respect to the lay expert opinion issue or the lay opinion issue. I, the, the government always goes with this divide and conquer approach in these big cases and say, well, they point out one or two examples of an improper opinion, but it was harmless, but this was pervasive. This is how they put on their case. And unfortunately, as trial lawyers, we have to try a case, not for appeal, but for a jury. And when you cross examine a law enforcement officer about the basis for his opinion, it only enhances their credibility in front of the jury. And then when we get on appeal, we have a word limit, but this is how the government puts on their case. That's why it's not harmless. All right. Thank you very much. Council United States versus Colossal at all will be submitted. And this session of the court is adjourned for today. Thank you.
judges: Wardlaw, Bea, Murphy